## DES MOINES COTTON MILL COMPANY v. THE YORK INVESTMENT COMPANY *et. al.* Appellant.

Corporations: CONTRACT BY CORPORATIONS. Part of the incorporators, before incorporating, made a contract with the remainder, in which they were named as parties of the first and second part respectively. As part of it, those named as parties of the second part conveyed lots held by them in severalty to the corporation, agreeing to aid in selling the lots, and not to sell in competition. *Held,* the contract is severable, and one incorporator is not liable because his fellows broke said agreement.

SAME. One is not liable in damages, because he did sell in competition with said lot sales in violation of said agreement, where the lots were sold by plaintiff, by a conveyance in the nature of a trust deed, at undiminished value, before said competing sales were made.

*Appeal from Polk District Court.*—HON. S. F. BALLIET, Judge.

THURSDAY, OCTOBER 25, 1894.

ACTION to recover damages for the alleged breach of a written contract. There was a judgment for the plaintiff, and the defendants appeal.—*Reversed.*

*Cummins & Wright, St. John & Stevenson,* and *Barcroft & McCaughan* for appellants.

*J. A. McCall* and *Gatch, Connor & Weaver* for appellee.

GRANGER, C. J.—The petition was addressed to the equity side of the court. The defendants, in their answers, made some claim that the proceedings should have been at law, but the claim was not pressed in the court below, and the appeal is here without an assignment of error, and it is to be determined as in equity. The whole controversy is based upon a written contract, of which the following is a copy:

"Memoranda made January 30, 1888, by and between E. R. Mason, Geo. H. Cowles, and J. F. Mason, parties of the first part, and Ben F. Elbert, York Investment Company, Wesley Redhead, and ——, parties of the second part, showeth: (1) That the parties hereto agree to associate themselves together as a body corporate for the primary object of erecting and operating a cotton mill in Polk county, Iowa, and, incidentally, for the purpose of buying and selling real and personal property. (2) The parties of the first part are to cause to be conveyed to said corporation about to be formed, clear of all incumbrance, the property known as the 'Jonesville Cotton Mill,' together with the implements, machinery, and mill property, not including stock, on hand and in process of manufacture, for which said parties of the first part are to be entitled to stock in said new corporation to the amount of thirty-two thousand dollars upon the understanding that the total stock of the company shall be fifty thousand dollars. (3) The parties of the second part are to cause to be conveyed to said new corporation ninety lots in Elbert & York's addition to Grant park, and others near thereto, which are to be clear of incumbrance, and for which the said parties of the second part are to be entitled to eighteen thousand dollars stock in said new corporation, upon the understanding that the total stock is fifty thousand dollars; all the lots to be of equal value, with the fair average of those in Elbert & York's addition, and as may be agreed upon between J. F. Mason, representing the parties of the first part, and J. H. York, representing parties of second part, except that Dean avenue lots are not to be included. (4) All parties to use their best endeavors to secure as large subsidies, both in money and property, as possible, which, including subsidies already subscribed, are to be the property of the corporation about to be

formed. (5) The new corporation is to issue its note for eleven thousand, five hundred and twenty dollars, due January 1, 1889, with eight per cent interest, which is to be guarantied by parties of the first part. (6) The new corporation is to issue its one or more notes to the total amount of six thousand, four hundred and eighty dollars, to be due January 1, 1889, with eight per cent interest, to be guarantied by some of the parties of the second part in proportion to the lots contributed by each, which said notes are to be secured by mortgage on the lots contributed, if the parties contributing and guarantying so desire. Parties of second part to guaranty money on said notes within ten days after issue. (7) Parties of the second part are to devote their time and energies to selling lots so to be contributed to said corporation about to be formed, and are not to offer other lots in said neighborhood in competition with lots of the company. Parties of the second part are not to be entitled to any commission or compensation for selling said lots, and all parties are at once to use their best endeavor to secure subsidies for the benefit of the company, in either money or property. (8) Parties of the second part are to be allowed to determine the location of said cotton mill, provided, only, that it be in an eligible, convenient location for such industry. (9) The mill to be erected to be not less than sixty-two by two hundred and twenty feet, of brick, two stories high, with not less than three thousand, five hundred spindles, and not less than one hundred and thirty looms, and not less than thirty set cards. (10) Articles of incorporation to be drawn in accordance herewith, under the laws of Iowa; the corporation to be managed by a board of five directors; three of the said board to be named by parties of the first part, and two by parties of the second part. Parties of first part are to name two, and parties of the second part one, of the execu-

tive officers.   (11)   The corporation to be completed
and conveyance made from the fifteenth to the twen-
tieth of February, 1888.   (12)   Parties of first part to
take charge of removal of said cotton mill, and to see
that it is moved so soon as can be done after the
incorporation of said company.   (13).   Upon filing of
articles of incorporation and transfer of property, J. F.
Mason is to take an invoice of stock in hand and the
new company is to purchase the same of parties of the
first part, and is to pay eight per cent interest on
the amount of such invoice till arrangements can be
made to pay the same.   (14)   The erection of the
buildings to be commenced not later than April 1,
1888, and to be finished as soon as possible, and mill
moved at once upon completion.

(Signed)        "J. F. MASON,
                "E. R. MASON, per J. F. M,
                "GEO. H. COWLES,
                "YORK INVESTMENT COMPANY,
                "J. H. YORK, President,
                "A. M. YORK, Secretary,
                "BEN F. ELBERT,
                "WESLEY REDHEAD."

Afterward, and before the suit was commenced, the
following assignment of said contract was made:   "All
our rights, including our right of action, arising under
the seventh paragraph of the written contract, is hereby
assigned to the Des Moines Cotton-Mill Company.

(Signed)        "E. R. MASON,
                "J. F. MASON,
                "GEO. H. COWLES."

The corporation known as the Des Moines Cotton
Mill Company was organized in pursuance of this pre-
liminary contract, and a cotton mill was erected and put
into operation.   Each one of the parties designated as
parties of the second part conveyed thirty lots to the
corporation in pursuance of that part of their obliga-

tion. The capital stock was fixed at one hundred thousand dollars instead of fifty thousand dollars, as provided in the contract. Sixty-four thousand dollars of this stock was issued to the Masons and Cowles jointly, and twelve thousand dollars to Redhead, and twelve thousand dollars to Elbert, and the same amount to the York Investment Company. The lots which they conveyed to the cotton mill company were owned by them in severalty, and stock was issued to each one for the agreed value of the lots which he alone conveyed; and there were at that time no stockholders other than the parties who joined in the written contract preliminary to the organization of the corporation. Some question is made as to the right of the corporation to avail itself of the provisions of the written agreement. It appears to us that there is no legal obstacle in the way of so doing, but, in our view of the case, this is not a material question. The right to adopt the agreement by the corporation will be conceded. It is to be remembered that the parties to the agreement and the corporators are identical. They all knew and understood just what was owned by each, and what each one was to put in as his share to make up the amount necessary to carry on the enterprise. It was well known to all of them that the cotton mill was to be located in the vicinity of the lots to be contributed by what was known as the "parties of the second part."

This action was commenced on the seventeenth day of September, 1889. The York Investment Company was made defendant, and it was charged in the petition that the investment company violated the seventh paragraph of the written contract, by failure to devote its energies to selling the lots of plaintiff, and by offering and selling its own lots in competition with the plaintiff's lots. Afterward, and on the twenty-

second day of February, 1890, the plaintiff amended its petition as follows: "Plaintiff hereby makes Wesley Redhead, by amendment, a party defendant in the above entitled action, jointly with York Investment Company, as a party to said contract set out in Exhibit A, annexed to the original petition herein, and makes the same allegations against the said Redhead, jointly with said York Investment Company, as are in said petition made against said York Investment Company, and asks the same relief against said Redhead." It appears that Wesley Redhead was a citizen and a resident of the city of Des Moines for many years. He died after he was made a party to this suit, and his executors were substituted as defendants. It will be observed that Redhead was charged with the same breach of contract as the York Investment Company; that is, he was charged with violating the seventh paragraph of the contract, by failing to devote his time and energies to selling plaintiff's lots, and for selling his own lots in competition with plaintiff's lots. There is no evidence that Redhead offered or sold any of his lots in competition with the lots of the plaintiff, and the whole record shows that he was not expected to take any active part in the use of his energy and other acts and devices necessary to sell the plaintiff's lots. It is not really claimed by counsel for appellee that Redhead's estate should be charged for any act or omission of his own, but the whole controversy as to his liability turns on the question whether he or his estate should be held liable for an alleged breach of the seventh paragraph of the contract by the officers of the York Investment Company. In other words, it is contended that there were but two sides to this contract—the parties of the first part and the parties of the second part —and that each of those on one side were liable for the acts of his coparties in all respects.

Vol. 92 Ia—26

We will not here repeat the several provisions of the contract. It appears to us that the construction of it contended for by counsel for the plaintiff is not warranted either by its terms or by a consideration of the circumstances surrounding the parties when it was executed. There is no express provision that each one of the parties should be bound to answer in damages for a breach of the seventh paragraph. It is true that the subject of the contract may be such that all may be liable for the failure of one of their number to obey and perform his obligations. But the subject of this contract, or the property to be put in, was lots owned by the parties of the second part in severalty. The obligation under consideration is like an obligation for personal services. No person can be bound in such case for the acts or omissions of another unless he can be said to have so contracted; that is, to stand as surety for him. Redhead agreed that he would be responsible if he put his lots on the market in competition with the lots of plaintiff, but he did not contract to answer in damages for such a violation of the contract by the York Investment Company. It was not a partnership transaction, nor a contract of guaranty. When the corporation was organized, and the stock issued to each of the incorporators, their joint undertakings, so far as pertained to the organization, were at an end. Each one was liable for his own acts alone. It seems to us that this is so plain that further consideration of the question is unnecessary.

Counsel for the plaintiff, in an elaborate and ingenious argument, in which numerous authorities are cited, seek, by an analysis of this contract, to maintain that the estate of Redhead is liable for the wrongful violation of this contract by the York Investment Company. This suit is in behalf of the cotton mill company as a corporation. It is not an action by a

creditor against the corporation, and the authorities cited by counsel do not appear to us to be in point. The contract must be construed by a fair analysis of its provisions, and with proper consideration of the sub-ject-matter, and no adjudged case or rule of construction of joint and several contracts can be applicable, because the contract and surrounding circumstances are not alike in any two cases. It appears to us to be perfectly plain that, under the evidence, the estate of Redhead is not liable. The plaintiff has no more standing in a court of law or equity against Redhead or his representatives than it would have to maintain an action jointly against two or more persons who contract to work and labor in its mill, and one of them failed to perform his contract. The designation of the parties as "parties of the second part" does not make them a unit in obligation and interest where there is no unity in fact.

II. The right to a judgment against the York Investment Company remains to be considered. It is a corporation. It does not appear just what the purpose of its organization is. It may be that it had power under its charter to take stock in cotton mills, and that it is liable for breaches of such a contract. It appears from the evidence that it owned city lots, and that much of its business was to boom real estate and inflate prices thereof by all sorts of methods known to persons so engaged; such as making sham sales, and taking back sham mortgages, for imaginary purchase money. In all such cases the public records show large sales and high prices. It is claimed, however, that it appears in evidence in this case that many of the sales complained of were valid trans-actions, and that they were a violation of the contract. We do not think it essential that an estimate be made of such sales, because, in our opinion, under the evidence and the acts of the parties, there is no right of

recovery in any amount.   It appears that the contract
upon which this suit was brought was made on the
thirty-first day of January, 1888.   The articles of
incorporation were made and acknowledged by the
incorporators on the sixteenth day of February, 1888.
The erection of the cotton mill was commenced in the
spring of that year, and it was put in operation some
time in the fall of the same year.   The sales of lots
made by the York Investment Company of which com-
plaint is made occurred in the year 1888.   On the sev-
enteenth day of August, 1888, the plaintiff by its deed
duly conveyed all of the said lots to J. M. Love.   By
this conveyance the plaintiff put it out of his power to
convey to any purchaser procured by the defendants
herein.   It is true that this conveyance was in trust
for certain purposes, not necessary to be stated in full
here; and it is strenuously contended that the convey-
ance to Love was a mere mortgage, and did not pre-
vent the defendants herein from effecting sales of the
lots.   This position is not well founded.   The convey-
ance to Love is a complete answer to it.   It is useless
to speculate as to what Love or his attorneys or agents
would have done in the way of making conveyances to
purchasers procured by the defendants.   When dam-
ages are recovered for a breach of contract, a legal
right to recover must exist.   In this case it should
appear that the defendants had a right to enforce con-
tracts of sale before they can be held liable for not find-
ing purchasers.   It appears by a clear preponderance
of the evidence that, when the sale and conveyance
were made by the plaintiff to Love, the lots were just
as valuable as they had been at any time after they
were conveyed by the defendants to the plaintiff.
This being the fact, there ought to be no contention
upon the question of the right to damages.   There is
really no question made as to the fact that the lots had
not depreciated in value when they were conveyed to

Love, excepting in the arguments in behalf of the plaintiff. As bearing on that question, the plaintiff introduced in evidence an affidavit of Wesley Redhead, of which the following is a copy.

"STATE OF IOWA, ⎱ ss.
  "Polk County. ⎰

"I, Wesley Redhead, being duly sworn, depose and say that I am a resident of Des Moines, and have been for the last thirty-seven and a half years. I am advised as to value of real estate in and around Des Moines. I know the property of the Des Moines Cotton-Mill Company, and I verily believe that the average value of the lots of said company to be more than three hundred dollars each, fifty foot front lots.

"WESLEY REDHEAD.

"Subscribed and sworn to before me, July 24, 1888.

"GEO. A. DISSMORE,

"Notary Public in and for Polk county, Iowa."

A like affidavit was made at the time by the secretary of the York Investment Company, with the exception that he fixed the value at five hundred dollars per lot in cash. If the lots were as valuable when the plaintiff conveyed them to Love as before that time no damages can be allowed.

The judgment and decree of the district court are REVERSED.